under advisement. The next case is Leckey v. Stefano. Leckey v. Stefano under advisement. May it please the court. I am Edward Leckey. William Caroselli was to have argued this appeal. He had a medical procedure performed on Friday. And we understand that he was taken ill, but correct me if I'm wrong, aren't you a fact witness in this case? I was deposed in this case. I did not testify. I've made affidavits. That's testimony. When you don't get to trial, the deposition is the testimony. I have made affidavits in this case. Actually, well, it just seems that there's a problem. We might, well, I don't know what the outcome would be. If we have to remand for a finding because there's some issue about what plan was in effect when. For the profit sharing plan. Which might require a remand. And we have a situation where counsel who argued the case on appeal, who is a deponent in the case, may be called as a witness on remand. I don't think I have any relevant testimony as to which plan it was. Well, you did have conversations at some point in time. You did have conversations about the applicable plan, which plan applied and suggesting amendments to the plan. Oh, I did. Early on. But before the plan was revised, I had nothing to do with the final revision to the plan. But do we know what the final revisions of the plan are? I think we do. I don't think there's any question about that, Your Honor. But wasn't the July 5, 1985 version allegedly lost? Pardon me? Wasn't the July 5, 1985 version of the profit sharing plan allegedly lost? I believe it's the July 1, 1985. With the incorrect table of contents, we have never been able to find it. Mr. Stefano argues that we've lost the July 5, 1985 version. Well, there was no July 5, 1985 version. There was a document that was adopted on July 5, 1985 by a unanimous vote of the Board of Directors. He argues that there was a version that was lost. That version, were it found, would contain the joint and survivor annuity language. Right. Because it's fairly important to know what the plan says. Oh, yeah. Well, that's our argument. Mr. Leck, can I ask you one question? Yes, sir. I have several questions. I want to start with a very pragmatic question. How much is left in the pot here? What are we arguing about? Yeah, why are we here? That is a very pragmatic question. The profit sharing plan, at the present time, we're talking about $389,000. Mm-hmm. If this Court determines that the Treasury regulation is valid, where are we with respect to the profit sharing issue? Would there be anything left to be decided by the District Court on remand? I don't think there would be anything left to decide on remand because it's perfectly clear that the correct plan, in spite of what the IRS regulation may say or not say,  a participant's account, which is the result of contributions, is payable in the form of a qualified joint and survivor annuity. That's the terms of the plan. I ask you to assume that if this Court determines that the Treasury regulation is valid, where are we? The answer is it makes no difference because the plan itself provides that upon termination of employment, a rollover contribution account is still paid out in the form of a qualified joint and survivor annuity. Let me turn to the pension plan. Ask this question if I may. If this Court upholds the District Court's determination that William Knapp did not act in bad faith in the termination of and distribution of assets from the pension plan, do the plaintiffs have a leg to stand on? In other words, even if Evelyn individually suffered a loss and even if that were the appropriate legal standard, how could the plaintiffs be entitled to damages regarding the pension plan when there's no breach of fiduciary duty? I think it's impossible to conclude that there is not. If you reach that conclusion, we lose. Are you saying it's impossible because bad faith is not a requirement or because there was bad faith? Two reasons. A, bad faith is not a requirement, and B, if it were, there is no issue about the terms of the pension plan. All the cases say that. We can hear you. There's a microphone. Isn't your argument that the plan, and I think I misspoke earlier about the dispute, you're claiming that the plan specifically contained a joint and survivor annuity provision, correct? Profit-sharing plan and pension plan, both. Okay. And then I thought your argument would be, at least I thought it was in the briefing, that based on our Burke case, if you don't follow as a fiduciary the plan language, that is ipso facto bad faith. I believe that's an accurate description of Burke. So for you to say that your answer to Judge McKee's question, I think you might want to revise that. Well, I don't think so. I mean, it's perfectly clear. You said there is no requirement of bad faith. Well, I don't. You don't mean that. I don't really mean that altogether. Before you proceed too far, maybe you can let us know, is there anything else that you intend to say during the course of your argument that you don't really mean? Or is that it? I think that there is no... The phraseology is imprecise, let me say. What is imprecise? I didn't hear that. My response is that there is no requirement of bad faith, no requirement of demonstrating bad faith. If the issue is, did the administrator properly construe the terms of a plan? The question is, even if he did it wrongly, did he do it in good faith? And that's good. And I suppose the opposite of that, it would be, we would have to demonstrate that he was acting in bad faith when he misconstrued the plan. But the fact is that, if the terms of the plan are clear and unambiguous, I don't care whether you say, that's a per se bad faith, or whether you say he can't prevail. What if you don't know what terms of plan... Yeah, what if you don't know what plan you got? I mean, that's our problem. Okay, that's the principal issue in this appeal. So doesn't that call for a remand? I don't think so at all. Because? Because. The system at Tucker-Orensburg was that a profit-sharing plan was three documents. One, a cover. Two, a table of contents. Three, the body of the plan. There is no question from the records at Tucker-Orensburg that the document, the body of the plan, has a draft date of 7-1-85. Why don't you finish your argument, but we go back and listen to these tapes. You have no idea what it's like at one o'clock in the morning to be listening to a tape recording and hear a boom, boom, boom on the podium. I apologize. Okay. There is no question that the draft date on the body of the profit-sharing plan is July 1-85. It would have been transmitted July 2-85, adopted by the Board of Directors approximately July 5 of 85. The only thing that does not bear a 7-1-85 draft date is the table of contents. And the table of contents bears a draft date of June 30-86. What the records at Tucker-Orensburg demonstrate is that the plan was transmitted on July 2-85, had a cover sheet with a draft date of July 1-85, had a table of contents that we have never seen and don't know exactly what it is, but presumably it was the old table of contents. But the body of the plan had a draft date of July 1-85, and that is the plan that contains. Where is it in the record, this particular plan you're referring to? It's in various places. The best place is in the affidavit of Richard Cramer. In the record... No, no, the plan's not going to be in the affidavit. Cramer may have referred to the plan he thought was operative in his affidavit, but the plan itself is not in the affidavit. Yes, it is, Your Honor. The plan is attached to it? The plan is attached to his affidavit. His affidavit is an 811-814-A of the appendix, and attached to his affidavit is a complete copy of the plan bearing draft dates. Where is it in the appendix that there is a July 1 document? Because I'm not familiar with any July 1 document. I'm familiar with a table of contents of June 26th and purportedly a body and cover pages that were on July 5th. Not July 1, Your Honor. But where is it in the appendix? And if it's going to take too long, maybe what you can do on... It would be immediately after the affidavit of 811-A. I keep coming back to where we started. It almost seems to me there's a letter referred to from you to Mr. Cramer indicating that the July, I guess it's 5 version, was adopted by the board. How in the world... July 1. Shouldn't... It almost seems to me rather than your being here today, we should have waited for Mr. Caruselli to get back because this just doesn't seem like it's working. The letter you're referring to is... But you're a fact witness. I come back to where we started. That's right. And likely to remain so again if there is a remand because your testimony could be critical in trying to figure out what plan was operative. You're saying that if you don't follow the provisions of the plan, that in and of itself could lead to a breach of a fiduciary duty without restoring a bad faith. You may well be right about that. There's an issue here about what plan was in effect when, what the provisions of that plan were, and you have testimony about that. Well, the letter that Judge Ambrose referred to is the July 8th letter in which I sent back to Richard Kramer three documents, one of which incidentally was not the plan. It was the resolution of the Board of Directors, it was the trust, and it was a third document. When is Mr. Caruselli going to be back in action? I don't know that for sure, Your Honor. I mean, Judge Ambrose and Judge McKee are not being rude. Oh, I understand. I mean, what are you doing here in plain English? Well, I think I'm representing the appellant. Well, I understand what you're doing, but the implications of what I'm asking, should you be here in the capacity in which you are standing there? That's the basic problem. Look, the fact is that I had nothing to do with the revisions to the plan. But now you're testifying. You're testifying. Yeah. Well, okay, I mean, you know, I'm sorry about that. Because the plan is, as I have it on page 15A of the appendix, it says, employees profit-sharing retirement plan effective February 15, 1985. So there's no July 1. They all say that, Your Honor, every single cover. But what happened was something came in June and July. There were a series of documents, and it either contains a joint survivor annuity provision or it does not. You say it does. They say it does not. And part of that is a letter from, of all people, you saying that the Board of Directors adopted a certain version. No, it did not say that, Your Honor. He's looking at it. There's a letter from you to Mr. Kramer saying that the July 5, 1985, version was adopted by the Board. The July 5, 85 version was adopted by the Board. If there's anything that says July 5, 85 version, it's a mistake. Did you ever hear that song, in the wrong place at the wrong time? I mean, I don't want to put the record on again. I'm only one of three, but this is getting malodorous. I've never seen anything quite like it. This is going to be a long day and a couple of other kind of interesting cases coming up. I'm not quite sure how to resolve it, but it seems to me, to put it mildly, a very awkward and precarious situation where there's a fact witness arguing and quasi-testifying because you're making statements today which are really factual statements, not legal arguments. Maybe the suggestion is let's let the other side and the Commissioner argue. And then as far as what you're saying, if what we could do is just take it on to briefs. Well, that would resolve it, at least help resolve it. Because, I mean, nothing you've said helps me. I get more confused. And it's not our job to resolve facts. We all understand that. Oh, I understand that. And so maybe what we ought to do is just hear from the other side and then you eschew rebuttal. I would just point out to the Court that I don't believe there's a question of fact as to what plan. That's an argument against your interest. That's all the more reason I think you might want to just— Well, I mean, the fact is that the records at Tucker-Arnsberg show that their last— But we're the last party. You've got to have this argument resolved by a trier of fact, by a district judge. I don't think there's anything to resolve. Well, but your plan is in place. There's a popular singer, Kenny Rogers, I don't know. He says, you've got to know when to hold them, you've got to know when to hold them, and you've got to know when to walk away. Selecting. Yes, 1968. You know, some of the comments here, and I'll plead guilty only in my— I mean, are as subtle as a sledgehammer. I think we ought to hear the other side. Thank you, Your Honor. I was thinking more in terms of mood indigo because I don't know when I've been this blue. Mr. Strasburger? Some days I just work here. Good morning, Your Honor. Good morning. Good morning, Your Honor. Good morning, Your Honor. Good morning. Let's start off at the beginning. Isn't there an issue of fact as to this profit-sharing plan as to whether it contains or does not contain a joint survivor annuity provision? I argued below that there wasn't an issue of fact, but that issue did go to trial, and it was resolved in our favor by the trial court at finding of fact number four, which is at page four of the opinion, record citation 33A. The court says the plan document marked Plaintiff's Exhibit 3 could not have been the draft of the AMCARB profit-sharing plan submitted to Knapp under the letter dated July 2nd, 1985. If this court determines that the Treasury regulation is valid, where are we with regard to the profit-sharing plan? Would there be anything left to be cited for the district court on remand? No, Your Honor, there wouldn't because the court already found in the context of the submitted with a board resolution did not contain a joint survivor annuity provision. That's a factual finding that is entitled to be upheld unless it's clearly erroneous, and there is substantial evidence in the record that it's not clearly erroneous. In fact, we had previously moved for summary judgment on that point. So if the operative plan did not include a QJSA provision, and if the regulation is valid, then that's it. Then that part of the case is over. There's no need to remand the case to the district court. Well, let me go. I'm trying to figure this out in paragraph 4. It's got the findings of fact by the court. The draft of the AMCARB profit-sharing plan with a cover sheet dated July 1 contained the spousal protection clause at paragraph 6.04, et cetera, et cetera. It should be noted, however, that only the cover page and page 1, titled Article 1 of this draft, are dated 7-1-85. The second page, titled Table of Contents, is dated 6-30-86. Therefore, the plan document marked Plans Exhibit 3 could not have been the draft. What does that tell us? That tells us that the last version of the plan that was submitted to Mr. Knapp did not contain or was not included with the letter dated July 2nd. But it never tells us which version was adopted. Well, but with the July 2nd, 1985 letter was the last board resolution. There are no board resolutions that are transmitted to Mr. Knapp after July 2nd, 1985. You earlier asked Mr. Leckie, where does the court make a finding of fact as to which version was adopted? It ain't paragraph 4. What paragraph 4 says is the version, the plan document marked as Exhibit 3, which is the version that contains the qualified joint and survivor. It says the document marked Plans Exhibit 3 could not have been the draft of the profit-sharing plan submitted to Knapp under cover of letter dated July 2nd. Right, and that has a qualified joint and survivor annuity provision in it. So you're saying that by negative inference, okay, which version of the plan was adopted? The April 1985 version was adopted. Where does it say that? Well, it's not disputed, Judge, because the first two versions of the plan did not contain it. Look, you're telling me paragraph 4 resolves a factual issue, and you're saying that paragraph 4 of the findings of fact of the district court provide that there is no joint and survivor annuity provision in the plan, correct? In the plan that was transmitted on July 2nd, 1985. Okay. That's what you're telling me. That's what I'm telling you. Where does paragraph 4 say that the joint and survivor annuity provision is not contained in the plan that was ultimately adopted by the board? Your Honor, paragraph 4 doesn't say that. However, there are all the different... But you start off by telling me paragraph 4 does say it. Now you tell me paragraph 4 doesn't say it. Doesn't this just call for a remand? I don't think so, Your Honor. Let me just... I know it's confusing. There are three board resolutions in the record, okay? There can only be an adoption of a version of the plan through a board resolution. The first board resolution is dated April 1985, and there's no dispute that that board resolution accompanied a plan document that nobody can find. That's what you referred to earlier. The second board resolution is on Mr. Leckie's typeset and refers to a transmittal that occurred before July 2nd, 1985. That's in the record. It was July 1st or might have been June 26th. The third transmittal... The second one has or does not have a QJSA provision? Does not, okay? And throughout this case, Janice Leckie has argued that the version of the plan that was transmitted on July 2nd, 1985 with Mr. Kramer's board resolution under Mr. Kramer's letter is the plan that contained the Qualified Joint Survivor Annuity provision. It's that letter. It's Kramer's letter to Bill Knapp dated July 2nd, 1985 that the plaintiffs have always said contains the Qualified Joint Survivor Annuity provision. And respectfully, Judge Ambrose, in paragraph 4, they say that Judge Sircone said that the plan document marked as Plaintiff's Exhibit 3, which is the document they've been relying upon that contains the annuity provision, could not have been transmitted with that board resolution. I'm sorry, I banged. That's all right. Could not have been transmitted on July 2nd, 1985. That's right. So you're saying, the only way I read it is by negative inference, the court must be saying that the profit-sharing plan ultimately adopted by the board did not contain a Joint and Survivor Annuity provision. That is correct, Your Honor. Why can't the court just say that? Well, can I... Because the court is a lawyer. Your Honor... This doesn't make sense to me. Your Honor, the reason it's so confusing, and with apologies to Judge Sircone, is that he made a mistake, in my opinion, at the summary judgment stage on the Treasury regulation. And so we're going to trial now on the issue... On transfers versus rollovers. Correct. And now we're going to trial on the issue of bad faith. Arguably, he punted. Is that correct? That would be a charitable way of describing it, Judge. I want to be checked. How do we know that the operative plan wasn't the one that's missing? Well, because the one that's missing was in April of 1985, and that one didn't have an annuity provision. There was the subsequent transmittal from Kramer in June that did not have an annuity provision, and that's the one that missed... June or July? Your Honor, was that late June or early July? Okay, early July, all right. Okay, and that's the one that Mr. Bill Knapp took to Jim Wirtz, who was the estate planning attorney. So you're assuming that the April 1985 plan, whatever it was, was, in terms of the QJSA, was the same as the July 2nd one, 85 plan, just because of the proximity in time? Yes, and Rick Kramer, who was the attorney at Tucker-Arensberg, testified that the original plan, which was in April of 1985, did not have an annuity provision in it. What about the pension plan? Well, the pension plan, Your Honor, our argument there is, and there's testimony in the record... Did the pension plan have a joint and survivor annuity? It did, it did. So if the pension plan has it, why isn't there a clear violation then? We're not arguing, Your Honor, that the withdrawals from the pension plan were proper. We lost on summary judgment at that stage, but we only lost on the question of liability. The issue for trial was still remedy. If the pension plan did not suffer a loss, does it matter whether Evelyn Knapp individually suffered a loss with respect to the pension plan? No, Your Honor, it doesn't, because if you're talking about a fiduciary duty claim, there's got to be a loss to the plan. And if this Court affirms the district court's finding that the pension plan suffered no loss, are there any issues that require further examination on remand with regard to the pension plan? No, I don't think there are, Your Honor, because once there's a factual finding that there's been no loss and there's evidence in the record to sustain that finding, it's not clearly erroneous. Therefore, there's really no need to remand for another trial once the Court's already ruled that there was no loss. No loss because? No loss for two reasons. The first reason is... She didn't get the money from the plan, right? She didn't get the money from the pension plan, but there's no evidence in the record as to what the annuity income... If there's a violation, the remedy is the annuity income, and Mr. Leckie didn't put in any evidence at trial of what the annuity income would be. However, my witness testified that if you take the combined assets of the pension plan and the profit-sharing plan and you go out and buy in an annuity, which is what is normally done in these circumstances, then the annuity income from that annuity would have been less than what Evelyn Knapp got from Trust B. And we called Mr. Stefano as a witness at trial, and he testified to all the income distributions that Mrs. Knapp received from Trust B, which essentially acted as an annuity. It served the same purpose as an annuity if he had gone to MetLife and bought an annuity. I mean, Mr. Knapp didn't take the money out of the plans and go down to Atlantic City and play blackjack with it. He put it in an insurance trust that provided substantial income to his wife for the remainder of her life, which is what the Retirement Equity Act wants. But isn't she entitled to the annuity, not just that she... In other words, if there's a joint and survivor annuity provision and it's violated, isn't the normal remedy a constructive trust? No, the normal remedy would be the annuity. I mean, the Retirement Equity Act says in the absence of a valid election, the remedy is an annuity. Boggs v. Boggs says you're supposed to... The purpose of the act is to provide a stream of income to the non-participant spouse. But make it simpler than that. If you take money out that otherwise belongs or should belong to the spouse who survives you, then isn't the normal equitable remedy under 1132A3, wouldn't that be a constructive trust? Your Honor... Not necessarily setting up the annuity, but wouldn't it be... If I take money, if I'm your fiduciary and money is taken out that should go to you, but I still have it somewhere, am I not held to a constructive trust for you as a remedy? Your Honor, I would say that a court sitting in equity has a number of remedies available to it. And there's not just one particular remedy that's... Well, that would be appropriate under 502. You'd agree with that, entrusting a trust on it. Of course. If the court had decided that a constructive trust was the only appropriate remedy, then I probably wouldn't be here arguing that that was clearly erroneous. But what the court did here is it said the appropriate remedy is the annuity income. And that was a factual finding, that she received everything she was entitled to receive if an annuity had been purchased. And I don't think we should be cabining district courts to decide there's only one remedy available for a particular breach. Part of the problem you have is you have a lot of Supreme Court law, whether it be Russell Mertens and Great West, that really do cabin what kind of remedies you can get and whether you have a remedy. But here it seems that the remedy would be, the one I can figure out, would be a constructive trust. Well, Your Honor, I... For the pension plan violation. I hope I can try to turn you around by asking you to look again at my brief because the Retirement Equity Act is designed to provide a stream of income to the nonparticipant spouse. That's what the Supreme Court said in Boggs v. Boggs. And so if... I don't think any of the cases say that there's only one remedy for a violation of ERISA. I think that a court of equity always has a discretion to... The REA applies to transfers but not rollovers, is that correct? The Retirement Equity Act applies if the plan is an indirect or direct transferee of a plan to which the annuity requirements apply. And she got a stream of income, did she not? She certainly did, Your Honor. What do you estimate? Give me a... $180,000 over approximately four years, plus she got discretionary distributions of principal. My time's up. Can I just say one thing about my opponent who I've been dealing with for a long time and I respect greatly? I really don't want to argue this case again because I think Mr. Leckie is an honorable man and he's not here trying to persuade the court because of his factual knowledge. No, I didn't mean to suggest that you were. Just that it's an awkward situation. I wasn't suggesting he was trying to manipulate anything. Good morning. Good morning. May it please the Court. Mercifully for your benefit, my voice is almost gone. Do you have water there? Do you want some water? You've got it over there, I guess. Good morning, Ms. Schmaling. Good morning, Your Honor. May it please the Court. In validating the Treasury regulation at issue here, District Court failed to recognize the effect of the difference between a rollover contribution on the one hand and a transfer of planned assets on the other. We had the same question, that's why we asked you to submit something. Yes. My main purpose of asking for oral argument was to answer any questions you might have. I mean, basically the purpose of the rollover treatment is to afford a participant the opportunity to continue deferral on taxation of retirement benefits he gets back that he normally would have to pay tax on. So the idea is rollover distribution first is a lump sum distribution of cash benefits. And it's followed by the participant's elective contribution to another plan. In order to get a lump sum distribution, the participant has to get his spouse's consent. So there is a waiver of the joint and survivor annuity. A cash distribution of benefits is an alternate form of distribution. So once the spouse consents to that distribution, in effect, the spouse waives the spousal annuity. Now, of course, if you transfer assets... Your waiver argument, you may well be right in terms of the regulation, but the reasoning for your argument I'm not sure necessarily follows. You're basically saying the spouse is on notice because there's already a waiver initially. I'm not sure that that necessarily follows, but it may not really matter if you're saying that if I'm a participant in a plan and I basically give the money to myself and then I turn around and that's the distribution and then I turn around and give it to myself again by way of contributing it to another plan in which, for me, there really is no transfer. It's like the agent giving the money to the principal or vice versa. There's really no transfer. It's the same legal entity. And I guess you're saying for tax purposes, there's no transfer, there's no taxable event because nothing is really moved to or from the participant. They still have the money. It's them. Which is different than if there's a merger, you're saying, where it goes to a different entity and in that sense there is a... I'm sorry, that would be the other role of a situation. It's different than if there is a merger where it actually goes to a different entity and that would be a transfer under the reg. So you're arguing that the transfer under subsection 3 is a term of art and when they talk about direct or indirect transferee, it's not just from X to Y. You've got to look at the legal relationship of X and Y to the entity whose funds are being transferred and if it's the same thing, same entity, be it a distribution on the one hand, then a contribution, there is no transfer. So you're saying you can't look at the transfer narrowly. You've got to look at it narrowly in the very specific legal term of art of what a transfer is in a distribution combined with a contribution even though it looks like a transfer, smells like a transfer, may even quack like a transfer, under the tax law, it's not really a transfer. It shouldn't surprise anybody who's ever dealt with the Internal Revenue Code that what it looks like is not really what it is. That's really what you're arguing. That's true. As a follow-up on Judge McKee's question, would you be kind enough to tell us what is an example of an indirect transfer under 1055 that would not qualify as a rollover contribution under the Treasury Regulation 26 CFR 1401? I went back and forth with the IRS on this, and it's my understanding that a direct transferee is when Plan A is subject to the Joint Survivor Annuity Requirements. The employer decides to separate off all the highly compensated employees and put them in another plan. So it spins off part of the plan. And then the indirect transfer would happen if there was another transfer to another plan subsequently. They would be the indirect transferee because it didn't occur between Plan A and Plan C. It happened between Plan A to Plan B. Why would that be indirect any more than a distribution combined with a contribution within 60 days of the initial distribution? Why would your situation, other than that's the legal result of your argument, why would that be an indirect transfer? Your Honors, I'm not sure that I actually can give you a great example of indirect transfer. I couldn't come up with one. I sat there, too. But the idea here is that when you have a spinoff, if the assets are spun off to another plan, there's no distribution to a participant for tax purposes. There's no opportunity for the participant to necessarily consent to that distribution, and the participant's spouse and the participant could lose some of their rights under the original plan if the assets could be transferred to another plan. In the case of a rollover, what's happening is the tax law creates the fiction that there isn't, is not a taxable event, even though when you receive a distribution of your retirement benefits, ordinarily you owe tax to the extent it represents untaxed compensation. Tax law says, hey, okay, we're going to treat this as if you didn't receive it, and we're going to allow you to continue deferral if you meet the rules. One of the rules is if you get a distribution and you have the money in your hand, you've got to get it into another plan in 60 days. Then Congress came along with the idea of a direct rollover so a participant wouldn't have to pay withholding tax. Because when you actually get the benefits back, even if you contributed within 60 days, the trustee has to take out 20% withholding. Now, Congress said that's not fair because in order to roll over the entire sum, they allowed for direct rollover. So what happens is the participant is treated as if it's a deemed distribution and the trustee just makes a transfer form. In both events, there's a taxable distribution. It's only that the code allows people to forego taxation at that point in time. In a sense, it's an elective receipt by the participant of the benefits and elective contribution. When there's a transfer of assets and liabilities, the participant has nothing to do with it. It's the sponsor, the employer, that's doing this. It's not the participant that's saying, hey, pay this to my new pension plan. It's a policy argument. I just wanted to bring that in. The student may not treat a transfer as a transfer. It's a look-back postponement. Exactly. That's exactly right. It's deferral, postponement. It's never being taxed. I see my time has been up for a while now. If the court doesn't have further questions, we urge the court to reverse the district court's decision on this point about the regulation being invalid. Because it not only affects this regulation, it also affects Regulation 1.401A31, cited in our brief, where the IRS explicitly says this. Was it a published opinion, the district court's decision? No. Was it a presidential opinion? It's not presidential, but I expect that we'll be citing it on every instance. Thank you, Your Honor. Yes, thank you. Thank you for letting me participate. Mr. Leckie, you're not going to adhere to the suggestion of Judge Ackerman that you bow to Rogers on appellate advocacy and fold him? Or just argue law. Or just argue law. The microphone is not picking you up. You know, if you're going to argue law, that's not a problem at all. I'm not going to argue any law. No, the point is, if you're going to argue law, that's good. If you're going to argue facts, that ain't so good. All I'm going to do is refer the court to four pages of the appendix. But that's unseemly in the context of your original appearance and your appearance here today. Forgive me for this comment. Why don't we just take it on the brief from your perspective? It's a lot cleaner that way. I know you're doing the best you can, but it's a messy situation. It is. And we know it's not your fault. And no one's throwing any stones at you. No one could have seen Mr. Caruselli's illness. I would just like to answer the question. This is tough. Why don't you send us, if you could submit a 28-J letter and point out the pages you want us to refer to as a copy to Mr. Strasburger and I guess Ms. Smalling. You probably don't care, really. But that would probably be a better way to do it. No, I'm not saying I want you to submit one. I'm saying if you insist on doing it, why don't you do it that way? I will submit a letter to the court. Okay. Thank you. Thank you very much. All right. We're going to take a break here, okay? Pardon? We're going to take a break here, all right? We're going to take a break. We're the board. Okay. Let's go one place one more. All right. As they say, moving right along. U.S. v. Tidwell.